UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM C. SWAN,

        Plaintiff,

   v.                                Case No. 17-cv-1472-pp

DANIEL KLAWIEN, and
ARAMARK FOOD SERVICE SUPERVISOR JOYCE,

        Defendants.

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 40, 46) AND DISMISSING CASE**

On October 26, 2017, the plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that several individuals violated his constitutional rights while he was an inmate working in the kitchen of the Walworth County Jail. Dkt. No. 1. The court allowed the plaintiff to proceed on an Eighth Amendment conditions-of-confinement claim against an Aramark Food Service Supervisor named Debbie and an Eighth Amendment deliberate indifference claim against Correctional Officer Daniel Klawien. Dkt No. 12. It also allowed the plaintiff to proceed on a state law negligence claim against Debbie. Id.

On March 9, 2018, the plaintiff filed a motion to amend/correct his complaint. Dkt. No. 16. He stated he had erroneously asserted that Debbie was the Aramark employee who had subjected him to the inhumane conditions of confinement, when it was a Supervisor named Joyce. Id. Construing the motion

1

as a motion to substitute parties, the court granted the plaintiff's motion and substituted Joyce for Debbie. Dkt. No. 26 at 4-5. The defendants have filed motions for summary judgment. Dkt. Nos. 40, 46.

## I. Facts

### A. Joyce

#### 1. *The plaintiff's allegations*

In his complaint, the plaintiff alleged that on July 24, 2016, he was working in the main kitchen area of the Walworth County Jail when Joyce told him to go empty the garbage "in the cooking area."[1] Dkt. No. 1 at 3. He said that as he was complying with this instruction, he walked past a kettle and "slipped on the floor which was wet, falling into an open drain pit, which the protective cover was not covering the opening, and had been removed and left open." Id. The plaintiff alleged that he was injured in several places as a result of the fall. Id.

The complaint alleged that the plaintiff had "originally been trained to work in a different area and was unfamiliar with this new area where the incident took place." Id. at 4. It asserted that the plaintiff "received no additional training when he was told to go work in this new area." Id. at 5. The plaintiff asserted that the inmate who had left the open drain pit unattended "had been trained by an Aramark supervisor to work in the area where the

---

[1] While the complaint identified the person who told the plaintiff to go to the cooking area as "Debbie," the court will refer to her as "Joyce," for the reasons stated in the introduction.

incident took place," and that it was an Aramark supervisor who'd called that inmate away from the pit (which he'd been cleaning) to help out "on the line." Id. at 4. The plaintiff alleged that it was "contrary to policy and safety protocol" for the inmate to leave the drain cover off and the pit exposed. Id. The complaint asserted that "no warning signs or caution warnings had been placed in this specific area." Id.

   2. *Training for kitchen workers*

  Joyce explains that inmates at the jail can apply to work in the kitchen. Dkt. No. 48 at ¶3. If an inmate is selected for such a job, he might be assigned cooking, cleaning and serving duties. Id. at ¶4. She says that inmates who worked in the kitchen are trained by Aramark employees "on their duties, responsibilities, and safety rules." Id. at ¶8. The training includes a walk-through of the whole kitchen with an Aramark employee, "at which time the inmate workers are shown where they should not go." Id. at ¶9. Joyce says that during this walk-through, Aramark workers also show inmate workers "where safety cones and wet floor signs are located throughout the kitchen." Id. at ¶10. She asserts that during the training, the Aramark employees instruct the inmate workers "to use cones and wet floor signs every time the floor is wet or there is any other potential hazard that should be addressed." Id. at ¶11. She also says that after the initial training, the Aramark employees constantly remind the inmate workers "to use wet floor signs and cones for any kind of potential hazard in the kitchen." Id. at ¶12. She emphasizes that these

constant reminders include telling inmate workers to use signs and cones "for even small issues so that corrections officers will not get injured if they have to run through the kitchen for any reason." Id. at ¶28. Once an inmate worker is trained, Joyce says, the worker spends time "shadowing other experienced inmate workers to see how each task in the kitchen should be performed." Id. at ¶14.

Specifically with regard to floor drains, Joyce says that "[i]nmate workers who are responsible for cleaning the floor drains in the WCJ kitchen are instructed by Aramark staff to replace the drain cover immediately once they complete their task," id. at ¶42, and that the workers "should not leave an open drain unattended," id. at ¶43. Joyce says that if such workers "must step away from their task for any length of time, Inmate workers who are responsible for cleaning the floor drains in the WCJ kitchen are instructed by Aramark staff that they should either replace the drain cover or put out a caution cone to warn others working in the kitchen about the open drain." Id. at ¶44.

Joyce asserts that "[s]afety in the WCJ kitchen is a paramount concern of Aramark Correctional Services, LLC." Id. at ¶26. She says that Aramark takes "every precaution to avoid a situation that could lead to a slip, fall, or injury to an inmate worker or Aramark employee in the WCJ kitchen." Id. at ¶27.

The plaintiff disputes some of these facts. He says that the jail never trained him to use wet floor signs. Dkt. No. 61 at 2. He submitted a general dispute to Joyce's proposed findings at ¶¶11-76, referring the court to his own

4

proposed findings of fact. Id. at 3. What the plaintiff submitted as his proposed findings of fact, however, is a reproduction of his complaint, with paragraph numbers added. Dkt. No. 60. It does not respond to Joyce's specific assertions about the training of inmate kitchen workers. The plaintiff also filed a document that he called a "declaration," but it, too, is a reproduction of his complaint. Dkt. No. 62. The documents the plaintiff attached to his "declaration" do not address Joyce's assertions regarding training of inmate kitchen workers. Dkt. No. 62-1.

3.    *The layout of the WCJ kitchen*

Joyce says that the WCJ kitchen "is separated into two sides divided by a four-foot wall." Dkt. No. 48 at ¶17. On the left side of that wall are the serving line and tables, id. at ¶18, and on the right side are "[t]he grill, the kettles, and the inmate break area," id. at ¶19. On the floor under "each of the large soup kettles" in the kitchen is a drain, "so that the kettles can be emptied after each use." Id. at ¶20. Joyce indicates that the drains on the floor of the right side of the kitchen "are open and obvious and can be easily seen as you walk through the kitchen." Id. at ¶59. She says that any inmate kitchen worker who isn't a cook is "instructed by Aramark staff that they should not go into the right side of the kitchen for any reason unless a Kitchen Supervisor specifically directs them to do so." Id. at ¶23. She explains that this rule exists for the inmate workers' safety, "because most cooking and food preparation occurs in the right side of the kitchen," id. at ¶24, and "[t]here is a greater risk for burns and

other accidents on the right side of the . . . kitchen as a result of the food preparations, so Aramark only allows cooks in this area." <u>Id.</u> at ¶25. Joyce says that there aren't any garbage cans near the soup kettles on the right side of the kitchen, so there would be no reason for an inmate worker "to walk through the right side of the kitchen while doing rounds or emptying garbages." <u>Id.</u> at ¶31. She also asserts that "[i]nmate workers are trained and instructed by Aramark staff that the garbage cans that are nearest to the soup kettles . . . can and should be accessed via a different route" than the one the plaintiff took on July 24, 2016. <u>Id.</u> at ¶32. Finally, Joyce asserts that inmate kitchen workers "are required to sign and acknowledge a list of Inmate Expectations, the very first of which states that inmate workers must stay in their assigned area unless asked by Aramark staff to help out in another area." <u>Id.</u> at ¶76.

As with the facts relating to the training of kitchen workers, the plaintiff's response to Joyce's proposed findings of fact did not specifically address those facts regarding the kitchen layout, and his own proposed findings and declaration were duplicates of his complaint.

### 4.     *The events of July 24, 2016*

Joyce asserts, and the plaintiff does not dispute, that in June 2016 he was granted the privilege of working in the kitchen as a server. <u>Id.</u> at ¶5. His duties included "serving food, washing dishes, sweeping and mopping, and emptying the garbage." <u>Id.</u> at ¶6. When he was working he "generally reported to the Aramark supervisor on duty." <u>Id.</u> at ¶7.

6

At his November 27, 2018 deposition, the plaintiff was asked whether he had "any sort of training or orientation" when he started working in the kitchen. Dkt. No. 49-1 at transcript page 66, lines 24-25. The plaintiff responded, "Little don't do this, don't do that. Wet floor signs, put them up was a big thing. Everything else, follow the guys' leads." Id. at transcript page 67, lines 3-5. He testified that inmates and staff "walked [him] through the process, then said,

> Like staff would be on the serving table. Oh, no, not that much in a spoon. Use this size spoon. And wipe this up when you go, put the wet floor signs up. Always change bags. Told me how to dump the garbage and stuff. And the guys taught me about dish washing. It's a big—it's a pretty big dish washing thing they got there. It takes eight people to run it. So that was a big process, so all different aspects of that too.

Id., lines 8-16. The plaintiff testified, when shown either a photo or diagram of the kitchen, that inmates were "not supposed to be here [presumably the right side of the kitchen] unless we're told," but that if he was told to "go back there" and do a round of garbage, or take dishes in there because the dishwasher had broken, he would do so, and that he wouldn't get in trouble for it. Id. at transcript page 72, lines 3-12. He testified that Joyce and another Aramark worker trained him. Dkt. No. 48 at ¶16.

The plaintiff testified at the deposition that on the day he fell, "[s]he [Joyce] told me to go check the garbage, being easy on me." Dkt. No. 49-1 at transcript page 79, lines 22-23. He testified that "she asked me do a round on the garbage real quick, Joyce did." Id. at transcript page 87, lines 14-15.

Counsel responded, "[s]o when Joyce said, hey, could you do a round quick, you took that to mean I need to check the garbage on both sides of the wall?" Id., lines 23-25. The plaintiff responded, "That's the rounds, yeah. That's what she wanted me to do." Id. at transcript page 88, lines 1-2.

At the deposition, the plaintiff described what happened next:

> I did my—started doing my rounds back by—It's a while ago. I
> started doing my rounds back by the dishwasher area, by our salad
> bar. We got a bar where we put all of our trays. And checked those
> garbages, went over to where—towards the deep fryer, and there's a
> garbage on the corner right there. Went around the curve going
> towards not Carl, but the other cook, and if I would have kept
> walking, my next garbage was going to be on the left around the
> aisle, around this—around this countertop like. And this cook is
> sitting there cooking, and he said something to me like something
> about what is cooking today, look at this crap or something today.
> Excuse me. And the next thing I was—boom, I flew into the pit.

Id. at transcript page 20, lines 21-25; page 21, lines 1-9. The plaintiff testified that he didn't see the pit because he was looking at the cook when the cook spoke to him. Id. at transcript page 21, lines 16-17. He testified that there were "no cones, no warning devices or nothing" at the pit. Id., lines 18-19.

As an attachment to his declaration, the plaintiff submitted a document with the Aramark logo at the top, containing the words "Daily Communication Log." Dkt. No. 62-1. The document contains a handwritten statement, which appears to be signed by Joyce. The statement says,

> Spivey was cleaning the drain in front of kettle. I called him to help
> on the line. After the line—[the plaintiff] was walking past the kettle
> and slipped and fell in the drain in front of the kettle. Spivey did not
> put the grate back on the drain when I called him to the line.

Id. The last line of the statement says, "I talked to Spivey and told him he had to put the grate back on drain if he walked away from it." Id. At his deposition, the plaintiff testified that Joyce "had to be aware" that the drain cover was off the drain, because "[s]he had Spivey cleaning [the drain]." Dkt. No. 49-1 at transcript page 88, lines 6-9.

Joyce submitted a declaration, stating that she didn't order Spivey to leave the cover off the drain, or to leave it uncovered, and that she wasn't aware that the drain had been left uncovered until after she learned that the plaintiff had fallen. Dkt. No. 50 at ¶¶19-21. She indicated that she didn't know how long the drain had been uncovered before the plaintiff fell. Id. at ¶22. She avers that she did not order the plaintiff to go into the right side of the kitchen on the day of the incident, that he shouldn't have been on the right side of the kitchen that day and that there were no garbage cans near the soup kettles on the right side of the kitchen. Id. at ¶¶14-16. She also asserts that the plaintiff didn't have to go through the right side of the kitchen to do his garbage rounds, and that he could have used a different route.[2] Id. at ¶18.

---

[2] Joyce states in her proposed findings of fact that the plaintiff admitted that he could have taken another route through the kitchen that day. Dkt. No. 48 at ¶30. In support of this assertion, she cites "Ex. C" to the declaration of defense counsel Heather Mills, at page 7. The court could not find an "Exhibit C" to the Mills declaration. It did find attached to the declaration the plaintiff's discovery responses. Dkt. No. 49-3. On the second page of his responses to the defendant's requests for admission, he refused to admit that he did not need to walk through the cooking area to empty the garbage, or that he was not supposed to walk through that area to empty the garbage. Id. at page 2. In his interrogatory responses, the plaintiff stated, "I could have taken another route

B.   Klawien

1.   *The plaintiff's allegations*

The plaintiff alleged that about two hours after the fall, "a nursing assistant examined [him] and gave him an ice pack and instructed to continue using ice on his shoulder." Dkt. No. 62 at 4. He asserted that "Officer [Klawien] refused [the plaintiff] another ice bag when he asked the officer for one." Id. He asserted that "[w]hile at the jail Officer [Klawien] refused an ice bag to [the plaintiff], although one had been prescribed." Id. at 5. He stated that he could not continue icing his shoulder when "Officer [Klawien] would not allow him a new [ice bag]." Id.

2.   *Klawien's proposed facts*

Klawien says that less than an hour after the plaintiff fell, a nurse went to visit the plaintiff in his cell. Dkt. No. 42 at ¶9. The plaintiff complained to the nurse of "shoulder, back and hip pain." Id. at ¶10. According to Klawien, the medical orders from the nurse's visit show that she ordered Ibuprofen for the plaintiff, told him that the jail doctor would see him soon and put the plaintiff on the list to see the doctor. Id. at ¶ 11. The orders made no mention of ice packs. Id. ¶ 12. In fact, Klawien asserts, the medical notes from July 26, 2016 contain a note at 4:37 p.m. stating, "No ice yet." Id. at ¶13. Klawien asserts

---

thru the kitchen but I still would have ended up by one cooking area or the other." Id. at page 7.

that at 5:00 p.m. on the 26th—twenty-three minutes later—there was a medical order directing "Ice to L shoulder & L hip/back as needed." Id. at ¶14.

The plaintiff did not file a response to Klawien's proposed findings of fact. As already noted, he filed his own proposed findings and his declaration, both of which were copies of his complaint into which he'd inserted paragraph numbers.

### 3. *The plaintiff's deposition testimony*

At his deposition, the plaintiff testified that he was "supposed to get an ice pack" but didn't; that the nurse did not give him an ice pack. Dkt. No. 49-1 at transcript page 34, lines 3-6. He testified that he heard the nurse tell Klawien to get the plaintiff an ice pack "when he gets a chance," but that the plaintiff never received an ice pack. Id., lines 9-10. He conceded that he didn't request ice in the two days after the fall, id. at transcript page 39, lines 9-10, and that he did get ice on July 26, id., line 12. The plaintiff testified that more than once or twice in the two days after the fall, he asked Klawien for ice. Id. at transcript page 53, lines 11-24. He testified that Klawien "didn't get [him]," said "that's for the nurse to do, something cocky." Id. at transcript page 54, lines 1-4.[3]

---

[3] Klawien's proposed statement of facts states that the plaintiff admitted that in the two days after the fall, Klawien informed the plaintiff that "his request for ice packs needed to be addressed and handled by the Jail medical staff." Dkt. No. 52 at ¶16. In support of this assertion, Klawien cites the plaintiff's deposition transcript at page 54, lines 1-9. The court could not find any such admission on that page, or in those lines, or anywhere else in the deposition transcript.

4.  *The medical records*

Klawien attached pertinent medical records as an exhibit to the declaration of jail administrator John Delany. The first record appears to be a list of the doctors' orders for the plaintiff for the period May 2016 through August 2016. Dkt. No. 44-1. That document shows that on July 24, 2016, someone ordered Ibuprofen for seven days by mouth, x-rays of the plaintiff's hip and lumbar spine and a referral to "Dr. Allison." Id. It also shows that on July 26, 2016—two days after the fall—at 5:00 p.m., someone ordered a shoulder x-ray, a continuation of the Ibuprofen for three weeks, an orthopedic referral, and "ice to L shoulder & L hip/back as needed." Id. The second document is a page of medical notes. Dkt. No. 44-2. The note from July 24, 2016 states:

> Inmate fell this afternoon while in kitchen. C/o L hip pain and lumbar pain as well as L shoulder pain. Pt able to bear his own weight and ambulate but exhibiting exaggerated limp. Has good ROM in his shoulder but c/o numbness & tingling through his arm and into his heck. He would like to see MD. Xrays obtained of L hip and lumber spine. Negligible for injuries or FX. Will TX c Ibu x7 days. Pt. cleared for return to kitchen. Place on MD list.

Id.

The note from July 26, 2016 at 4:37 p.m. is more difficult to read, but it appears to mention that the plaintiff had an x-ray of his hip and lumbar spine and was on Ibuprofen, and states, "No ice yet." Id. It contains the plaintiff's vitals, then contains some illegible language. The court can make out, "Fell L

12

RTC injury: xray. Ref for [illegible] possible rotator cuff tear. Ice, [illegible]." Id. The next line says, "[illegible] spring: ice, [illegible]." Id.

## II.    Analysis

### A.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must designate specific facts that establish that there is a genuine triable fact. Fed. R. Civ. P. 56(e). The court grants summary judgment when no reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B.    Discussion

#### 1.    *Joyce*

##### a.    The applicable Constitutional standard

The court allowed the plaintiff to proceed against Joyce on a claim that she subjected him to unconstitutional conditions of confinement.

In its March 5, 2018 screening order, the court noted that the complaint did not indicate whether the plaintiff was a pretrial detainee or a convicted

13

prisoner at the time he fell. Dkt. No. 12 at 8. Why did that matter? Because at the time the court issued its screening order, Seventh Circuit law provided that a plaintiff's "constitutional rights as a *pretrial detainee* are derived from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which is applicable to *convicted prisoners*." Smith v. Dart, 803 F.3d 304, 209 (7th Cir. 2015) (citing, among others, Kingsley v. Hendrickson, ___ U.S. ___, 135 S.Ct. 2455, 2475 (2015)) (emphasis added). The Seventh Circuit explained that "[i]n the context of a conditions of confinement claim, a pretrial detainee is entitled to be free from conditions that amount to 'punishment,' *Bell v. Wolfish*, 441 U.S. 520, 535 . . . (1979), while a convicted prisoner is entitled to be free from conditions that constitute 'cruel and unusual punishment.' *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)." Id. The court held that "[i]n both cases . . . , the alleged conditions must be objectively serious enough to amount to a constitutional deprivation, and the defendant prison official must possess a sufficiently culpable state of mind." Id. (citations omitted).

The defendants have answered the question regarding the plaintiff's status as of the date of the fall. The plaintiff was booked into the Walworth County Jail on May 2, 2016. Dkt. No. 48 at ¶1. At that time, he had been *charged* in Walworth County Case No. 16-CF-218, but not convicted. On July 22, 2016, however—two days before the fall—the plaintiff entered a guilty plea to the charges against him and was sentence to a prison term, so he was a

convicted person when the fall into the drainage pit occurred. Dkt. No. 42 at ¶3; State v. William C. Swan, Case No. 2016CF000218 (Walworth County Circuit Court), accessible at https://wcca/wicourts.gov. The court will analyze his conditions of confinement claim against Joyce under Eighth Amendment.

The Eighth Amendment imposes on prison officials a duty to "provide humane conditions of confinement," which means that they must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To state a constitutional claim that his conditions of confinement amount to cruel and unusual punishment under the Eighth Amendment, a plaintiff must allege that the deprivation he suffered was serious enough to warrant constitutional protection, and that the defendant's state of mind was "one of deliberate indifference to inmate health or safety." Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001).

The plaintiff claims that Joyce put him in a dangerous position by directing him to do a garbage round (which, he claims, required him to go through the right side of the kitchen, an area for which he had not been trained), knowing that one of the other inmates was cleaning a drain in that area. He testified at his deposition that Joyce had to be aware that the drain was not covered, because she'd directed the other inmate to clean the drain. "Demonstrating deliberate indifference towards a prisoner's safety needs

requires a showing that the inmate was 'incarcerated under conditions posing a "substantial risk of serious harm,"' [*Palmer v. Marion C'nty*, 327 F.3d 588, 593 (7th Cir. 2003)] . . . , and a showing that individual prison officials had subjective knowledge of the risk of harm, which they personally disregarded, *id.*" Grieveson v. Anderson, 538 F.3d 763, 775 (7th Cir. 2008). Regarding the second prong—the prison officials' subjective knowledge of risk—"the inquiry is not whether individual officers *should have known* about risks to [the plaintiff's] safety, but rather whether they *did* know of such risks." Id. (citing Farmer, 511 U.S. at 842-43). The plaintiff must "present evidence raising a triable issue of fact that [the defendant] knew of and consciously disregarded an excessive risk to his health and safety." Daugherty v. Page, 906 F.3d 606, 611 (7th Cir. 2018) (citations omitted).

      b.    Application of the law to the facts

      i.    **Substantial Risk of Serious Harm**

The court first must determine whether the plaintiff has raised a genuine dispute as to any material facts regarding whether he was incarcerated under conditions posing a substantial risk of serious harm. The defendants have presented evidence that inmates working in the kitchen received training, both from Aramark employees and from other inmate kitchen workers, about kitchen safety. The plaintiff generally disputed those facts; his only specific response was his statement that he was not trained to use wet floor signs. Dkt. No. 61 at 2. But his own deposition testimony contradicts that response; he

testified that he received training before working in the kitchen, which included "[w]et floor signs, put them up was a big thing. Everything else, follow the guys' leads." Dkt. No. 49-1 at transcript page 67, lines 3-5. At any rate, the question a jury would need to decide is not whether the plaintiff knew to put up wet floor signs, but whether other staff and inmate workers were trained to put up wet floor signs, or to cover drains after cleaning them or before walking away from them. The plaintiff has submitted no evidence to show that inmates did not receive such training.

The plaintiff alleged that he was not trained to work on the right side of the kitchen, but that Joyce sent him there anyway; he maintains that even if he'd taken a different route to collect the garbage, he still would have ended up in the cooking area. Joyce disagrees that the plaintiff had any need to go to the right side of the kitchen to comply with her request that he perform a round of garbage duties, and that there were no garbage bins near the soup kettles on the right side of the kitchen. Joyce says the plaintiff should not have been on the right side of the kitchen and knew that; the plaintiff says that he wasn't generally supposed to be on the right side of the kitchen, but that if he was told to go there, he would, and wouldn't get in trouble for it.

There is no dispute that the right side of the kitchen, where the cooking takes place, presented more risks to inmate safety than the left, but the parties dispute whether in telling the plaintiff to perform his garbage duties, Joyce was essentially directing the plaintiff to go to the right side of the kitchen, and

whether performing garbage duties required the plaintiff to go to the right side of the kitchen. The question is whether this dispute is material to the plaintiff's claim. The plaintiff was not injured by burning grease, or by a hot grill or an open flame. He was not injured by any of the cooking items that make the right side of the kitchen more risky to inmate safety than the left. And even if a jury found that Joyce specifically directed the plaintiff to walk through the right side of the kitchen on his way to collect garbage, the plaintiff has presented no evidence that a one-time walk through the kitchen area subjected him to unconstitutional risk. In fact, he testified that he had been in the kitchen area before (despite his lack of training). He testified at his deposition that if "they"—presumably Aramark supervisors—wanted an inmate to take dishes into the right side to wash them because the dishwasher was broken, "which happens a lot, we wash them right here." Dkt. No. 49-1 at transcript page 72, lines 10-12. He testified that he had "slice[d] breads back there," and that when asked to, he had "mopped back there." Id. at transcript page 87, lines 8-10.

The condition that posed the substantial risk of serious harm to the plaintiff was the open floor drain. While she does not say so directly, Joyce implicitly concedes that an open floor drain presented a hazard. She discussed the fact that inmates assigned to clean floor drains were instructed to put the covers back on after cleaning, and not to walk away from an uncovered drain or leave it unattended. A reasonable jury could find the undisputed fact that the floor drain that caused the plaintiff's fall was open, without its cover, and

18

without wet floor signs or cones around it, was a prison condition that posed a substantial risk of serious harm to the plaintiff.

      ii.      **Subjective Knowledge of Risk and Disregard**

No reasonably jury, however, could conclude from the facts in this record that Joyce had subjective knowledge of the risk posed by the open drain, or that she consciously disregarded that risk. In her declaration, Joyce attested to the training provided to inmates who clean drains. She attested to the emphasis Aramark staff put on training inmate kitchen workers to use wet floor signs and safety cones. Joyce attested in her affidavit that she did not know that that the drain was uncovered until after the plaintiff fell into it, and the plaintiff presented no evidence to contradict Joyce's sworn statement. He speculated at his deposition that Joyce had to have been aware of the open drain, because she was the one who had directed Inmate Spivey to clean it. First, that is not evidence—it is speculation. Second, the fact that Joyce directed Spivey to clean the drain does not require the conclusion that she knew that Spivey had walked away from the drain and left it open, without wet floor signs or cones. Neither party provided a declaration from Spivey, so there is no evidence indicating whether he had been trained in how to clean drains, or in using wet floor signs and cones. But Joyce's declaration—which drew only a general objection from the plaintiff—asserted that inmates assigned to clean drains received that kind of training.

For a defendant to be liable for consciously disregarding a substantial risk of harm to an inmate, the "defendant must know of facts from which [s]he could infer that a substantial risk of serious harm exists, and [s]he must actually draw the inference." Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The plaintiff's speculation that Joyce must have known that Spivey had walked off and left the drain uncovered because she was the one who directed him to clean the drain is not sufficient to raise a genuine dispute as to the material fact of whether Joyce was aware of the risk and consciously disregarded it. See, e.g., Collins v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006) (quoting Estate of Novack ex rel. Turbin v. C'nty of Wood, 226 F.3d 525, 529 (7th Cir. 2009) ("'[I]t is not enough that there was a danger of which a prison official *should have been aware*,' rather, 'the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'").

The plaintiff should not have been injured, and the court regrets that he was. But the facts indicate that it was *Spivey*, the inmate who left the drain uncovered and unmarked with signs or cones, who caused the risk to the plaintiff, not Joyce. The plaintiff cannot sue Spivey under §1983, because Spivey was an inmate, not a state actor. So the plaintiff has sued Joyce. But the Constitution does not allow a plaintiff to sue a "substitute" when the person responsible for his injuries can't be sued. Minix v. Canarecci, 597 F.3d 824, 833 (2010) (quoting Palmer v. Marion Cty, 327 F.3d 588, 594 (7th Cir.

2003) ("individual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation'")).

Because no reasonable jury could find that Joyce knew of a substantial risk of serious harm to the plaintiff and consciously disregarded it, the court will grant summary judgment in favor of Joyce. Because that means that the plaintiff has no federal constitutional claim against Joyce, the court will decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims. See Coleman v. City of Peoria, Ill., No. 18-1742, 2019 WL 2240575, at *12 (7th Cir. May 24, 2019) ("Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial.").

2.   Klawien

   a.   Applicable Constitutional Standard

Since the court issued the screening order, the Seventh Circuit has decided Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018). In Miranda, court concluded that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley* [v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2455, 2475 (2015)]." Id. at 352. The Kingsley Court held that a pretrial detainee pursuing an excessive force claim "did not need to prove that the defendant was *subjectively* aware that the amount of force being used was unreasonable," only that the defendant's "conduct was *objectively*

21

unreasonable." Id. at 351 (citing Kingsley, 135 S.Ct. at 2472-73). That standard stands in stark contrast to the Eighth Amendment standard—the one this court used when screening the plaintiff's claims—because the Eighth Amendment standard requires a plaintiff to show that he had an "objectively serious medical condition" *and* that the prison official "actually knew of, but disregarded, a substantial risk to the inmate's health." Cesal v. Moats, 851 F.3d 714, 721 (7th Cir. 2017) (citing Farmer v. Brennan, 511 U.S. 825, 836-38 (1994)).

If the plaintiff had been a *pretrial* detainee at the time he suffered the fall, therefore, he would have had to show only that Klawien's conduct was "objectively unreasonable" in order to defeat summary judgment. But as the court discussed in addressing the plaintiff's claim against Joyce, the plaintiff had been convicted by the time he fell into the pit and was injured. That means his claim against Klawien is subject to the Eighth Amendment deliberate indifference standard, which requires him to show that he had an objectively serious medical condition and that Klawien actually knew of, but disregarded, a substantial risk to the plaintiff's health.

b.     Application of the law to the facts

i.     **Failure to Exhaust**

Klawien first asserts that he is entitled to summary judgment because the plaintiff did not exhaust his administrative remedies regarding Klawien's alleged failure to provide him with ice packs. Dkt. No. 41 at 5. The Prison

Litigation Reform Act (PLRA) provides that a prisoner cannot bring a lawsuit in federal court "until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a); <u>see also</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). Exhaustion requires that a prisoner comply with the rules applicable to the grievance process at the inmate's institution. <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (7th Cir. 2002).

Klawien asserts that the plaintiff submitted two grievances related to the fall. Dkt. No. 41 at 6. He says that the plaintiff submitted the first grievance on the date of the injury—July 24, 2016—but mentioned nothing about ice packs, and that he filed the second grievance on August 15, 2016, which again mentioned nothing about ice packs. <u>Id.</u>

Klawien made these assertions in his brief, dkt. no. 41, and in his proposed findings of fact, dkt. no. 42. In the proposed findings of fact, Klawien referenced the plaintiff's deposition testimony as evidence that the plaintiff had not exhausted his administrative remedies. Dkt. No. 42 at ¶¶26-32. For some reason, however, Klawien did *not* file the two alleged grievances as exhibits to his summary judgment motion or proposed findings of fact, nor did he provide the court with a grievance log. Nor did Klawien provide a declaration or affidavit.

Defense counsel questioned the plaintiff about one grievance, allegedly dated July 24, 2016, at the deposition. Dkt. No. 49-1 at transcript page 50,

lines 2-7. Counsel did not indicate the number of the grievance. He simply asked the plaintiff whether that grievance referred to ice. Id., lines 11-12. The plaintiff responded that "[t]he one—the other grievance does, the one that's been notarized." Id., lines 13-14. The plaintiff testified that he had submitted another grievance complaining of failure to receive ice, and that he had it in his room. Id., lines 23-24; page 51, lines 1, 3-5. With regard to a second grievance, dated August 15, 2016, Klawien referenced page 16 of the deposition transcript at lines 1-4; that portion of the transcript says nothing about a grievance or ice, but is the plaintiff's explanation of the types of work he'd done in the kitchen. Klawien also references an "Exhibit 9," which he indicates the plaintiff "submitted . . . to the Court and all parties involved in this litigation (through a handwritten and notarized letter) on August 15, 2016." Dkt. No. 42 at ¶30. Klawien does not explain where the court might find this "Exhibit 9." The plaintiff could not have submitted a document to the court on August 15, 2016, when he didn't file this lawsuit until October 26, 2017. Perhaps Klawien meant that the grievance was dated August 15, 2016, and the plaintiff submitted it to the court on some other date. The court has looked at every attachment to every document the plaintiff filed prior to the date Klawien filed his proposed findings of fact, and has not found the handwritten, notarized letter to which Klawien referred. The plaintiff filed several attachments to his declaration. Dkt. No. 62-1. One of those is a handwritten statement marked "Exhibit B." Id. at 2. In the upper left-hand corner, someone has written "Wm.

Swan." In the upper right-hand corner, someone has written, "Signed before me on 8-15-16 Tracey [illegible], My Commission expires 8-8-19." Id. The document contains a handwritten statement that begins, "Requested ice packs with the Motrin for 21 days," and says that "Ive been going to therapy for my shoulder for two weeks and my lower back is still in pain with no help except for the Motrin." Id. The document ends with the writer indicating that he or she is giving "formal written notice that I will be filling a claim for personal injury, damage and suffering due to negligence, bodily harm and possible permanent damage." Id.

Maybe this document is the "grievance" to which the plaintiff referred in his deposition, and to which Klawien refers in his proposed findings of fact. The court does not know. But by failing to provide the grievances themselves, or a grievance log, Klawien has failed to raise a dispute of material fact as to whether the plaintiff exhausted his administrative remedies. The less-than-clear testimony at the deposition does not suffice. The court will not grant summary judgment in favor of Klawien on exhaustion grounds.

ii.     **Serious Medical Need**

Klawien did not address the question of whether the plaintiff's injured shoulder constituted a serious medical need. "[D]elays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims." Gutierrez v. Peters, 111 F.3d 1364, 1372 (7th Cir. 1997). While noting the difficulty in determining what constitutes a "serious" medical

25

need, the Seventh Circuit has applied the following standard: "A [serious] medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 1373 (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977) (and collecting federal cases)). "All of this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim, for clearly that is not the case." Id. at 1372. "A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." Id. (quoting Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996)).

The complaint alleges that a corrections officer visited the plaintiff after his fall, and determined that his injury was severe enough to warrant seeing the medical staff. Dkt. No. 1 at 3. That was what caused the nurse to come and see the plaintiff. Id. The complaint says that the plaintiff was "visibly expressing great pain and discomfort" when the corrections officer saw him. Id. at 4. The plaintiff alleges that on August 3, he saw an orthopedic specialist, who gave him cortisone injections in his shoulder and told him he needed physical therapy (which, eventually, he received on three occasions). Id. at 5.

He alleges that in October 2016, an MRI revealed that he had suffered a rotator cuff injury. Id.

The evidence indicates that it wasn't until July 26 that a doctor diagnosed the plaintiff's injuries. But because Klawien did not challenge the nature of the plaintiff's injuries, the court will assume for the purposes of summary judgment that they were somewhat obvious.

ii. **Deliberate Indifference**

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Srv., 577 F.3d 816, 828 (7th Cir. 2009)). If an inmate is under the care of prison medical professionals, a non-medical prison official "will generally be justified in believing that the prisoner is in capable hands." Arnett, 658 F.3d at 755 (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)). Non-medical correctional officers may rely on expert care afforded by prison medical professionals so long as the prison staff does not entirely ignore the inmate. Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005).

The complaint alleges that the nurse who came to see the plaintiff immediately after he fell gave him an ice pack, but that Klawien refused to give the plaintiff another one when the plaintiff asked for it. The medical record makes no mention of the nurse having given the plaintiff an ice pack, or of

anyone ordering an ice pack, until July 26, 2016—two days after the fall. In his deposition, the plaintiff testified that the nurse told him she was going to give him an ice pack but failed to do so. He also testified that he asked Klawien more than a couple of times for an ice pack, but that Klawien did not get him one, and responded with a comment to the effect that that was for the nurse to do, which the plaintiff interpreted as being "cocky."

The plaintiff has not identified a genuine dispute of material fact regarding whether Klawien was deliberately indifferent to his serious medical needs. By the plaintiff's own account, he received medical treatment just after the fall—the corrections officer determined that he needed to be seen, and the nurse came to his dorm. The records show that she gave the plaintiff Ibuprofen and put him on the list to see a doctor. The medical records contain no evidence that the nurse "prescribed" the plaintiff an ice pack, and the plaintiff's own testimony at the deposition is that the nurse said she was going to get him an ice pack, but never did. Even assuming that the plaintiff asked Klawien a few times to get him an ice pack, and that Klawien responded that a nurse would have to do that, Klawien was not deliberately indifferent. There is no evidence that anyone had prescribed ice packs for the plaintiff between July 24 and 26. There is no evidence that Klawien believed that the plaintiff had been prescribed ice packs during that period. Klawien was entitled to assume that the medical care the plaintiff was receiving was sufficient, and to rely on the judgment of the medical professionals. There is not even evidence that Klawien

had reason to believe that the plaintiff was suffering from a serious medical need. And regardless of what Klawien did or did not do, there is no dispute that the plaintiff received treatment for his injuries. He received treatment from the nurse the day of the injury, he saw the doctor two days later (when the doctor *did* prescribe ice for the injury), and a week later, the plaintiff saw an orthopedic specialist.

No reasonable jury could find that Klawien was deliberately indifferent to the plaintiff's serious medical need.

## III. Conclusion

The court **GRANTS** the defendants motions for summary judgment. Dkt. Nos. 40, 46.

The court **ORDERS** that this case is **DISMISSED**. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief

from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 18th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**